MICHAEL DORSEY NEEDHAM,    )
           )
        Petitioner,    )
           )
vs.           )
           )      **ORDER**
KEITH WHITENER,    )
Administrator, Alexander Correctional    )
Institution,    )
        Respondent.    )
_____)

**THIS MATTER** comes before the Court on Respondent's Motion for Summary

Judgment, (Doc. No. 12), as to Petitioner's petition for writ of habeas corpus, brought pursuant

to 28 U.S.C. § 2254.

## I.    BACKGROUND

Petitioner is a prisoner of the State of North Carolina, who on November 18, 2010, in

Lincoln County Superior Court, was convicted after a jury trial of first-degree rape of a child,

first-degree sexual offense of a child, second-degree sexual offense with a child over the age of

twelve, and taking indecent liberties with a minor.  (Doc. No. 13-2 at 34-45).  The trial court

sentenced Petitioner to 788 to 1,035 months' imprisonment.  (Id. at 4).  Petitioner was

represented at trial by Thomas J. Wilson, Jr.  (Id. at 49).

Petitioner appealed and, in an unpublished opinion filed February 7, 2012, the North

Carolina Court of Appeals found no error in Petitioner's criminal judgments in part, but

concluded that Petitioner was erroneously required to register as a sex offender and submit to

satellite-based monitoring on two of Petitioner's convictions.  State v. Needham, 721 S.E.2d 763

(N.C. Ct. App. 2012).  Petitioner was represented on appeal by Mr. Russell J. Hollers, III.

On March 13, 2012, Petitioner filed a petition for discretionary review with the North Carolina Supreme Court, which petition was denied on June 13, 2012. State v. Needham, 366 N.C. 220 (2012). On April 4, 2013, Petitioner filed a motion for appropriate relief ("MAR") in Lincoln County Superior Court. See (Doc. Nos. 13-9; 13-10). The MAR Court denied Petitioner's MAR on April 23, 2013. (Doc. No. 13-11). On May 17, 2013, Petitioner filed a petition for writ of certiorari in the North Carolina Court of Appeals, seeking review of the denial of his MAR. See (Doc. Nos. 13-12; 13-13; 13-14). The North Carolina Court of Appeals denied the certiorari petition on July 2, 2013. (Doc. No. 13-15). Petitioner submitted the pending § 2254 petition to this Court on July 16, 2013, and it was stamp-filed on July 23, 2013.

On August 26, 2013, Respondent filed the pending motion for summary judgment. (Doc. No. 12). On August 27, 2013, this Court entered an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), granting Petitioner fourteen days to respond to the summary judgment motion. (Doc. No. 14). On September 5, 2013, Petitioner filed a response to the summary judgment motion. (Doc. No. 15). Petitioner alleges the following grounds for relief in his § 2254 petition: (1) that the State introduced inadmissible evidence against him at trial; (2) that he was denied counsel at a critical stage of trial, received ineffective assistance of counsel, and was denied due process; (3) that the prosecution illegally obtained witness testimony through coercion; and (4) that he was denied his right to free speech at trial while testifying.

The North Carolina Court of Appeals succinctly summarized the facts underlying Petitioner's convictions as follows:

> Defendant is the father of A.N., his daughter, who was born on 15 January 1995. On 13 January 2007, defendant was released from prison and returned to his home which he shared with his mother and A.N. At that time defendant had full custody of A.N. On the night of defendant's release from prison, defendant began to inappropriately touch A.N., who was two days short of her twelfth birthday. A.N. woke up to find defendant lying next to her in bed. Defendant

removed A.N.'s shirt and pants and she felt him rub his genitals against hers. He subsequently put his penis in her mouth and also told her that he wanted to take her virginity. Many similar instances followed this initial one. A.N. estimated at trial that there were probably thirty to forty instances between 13 January 2007 and her thirteenth birthday. The instances would usually involve defendant rubbing his penis on A.N.'s vagina until he ejaculated. Occasionally, he would put his penis in her vagina. At one point A.N. was taking a nap after school and awoke to defendant's hand on her vagina. Also, he once made her watch pornographic movies with him. A.N. testified to an instance after she turned thirteen when defendant made her put her hand on his penis and rub up and down until he ejaculated. Social workers had occasionally come to the house, but A.N. never reported the sexual activity because defendant had threatened to kill her.

In March of 2009, A.N. went to live with her mother in Colorado. Around that time, Allison Black, a child protective services worker, received a report regarding defendant's interaction with A.N. The report stated that defendant had a history of substance abuse and mental illness and that at the time he was not taking his prescribed medications. The report also noted that defendant was making A.N. clean the house at all hours; she was cold and tired at school; the home was without running water; and the home life was unstable. A.N. also complained in the report of the inside of her legs hurting, but when questioned she would not give a straight answer.

A few days after the first report, Ms. Black received another report alleging that A.N. had seen defendant shooting crystal methamphetamine in recent days. A.N. told the reporter that defendant had taught her how to make crystal methamphetamine. As a result of the report, Ms. Black went to defendant's house with law enforcement and a search warrant. Ms. Black advised defendant that he needed to make alternative arrangements for A.N.'s living and care.

On 1 April 2009, A.N. told her mother about the incidents with her father. A.N.'s mother immediately reported the sexual activity to the Colorado Springs Police Department ("CSPD") and then to the Lincoln County Sheriff's Department ("LCSD"). On 5 June 2009, Kelly Schepplebein, an investigative specialist with the CSPD, interviewed A.N. and made recordings of threatening voicemails left by defendant on A.N.'s cell phone. Detective Sally Dellinger with the LCSD, received the reports on 26 June 2009 and subsequently went to defendant's house on July 1, 2009, where she encountered defendant and his girlfriend high on heroin. According to Detective Dellinger, defendant told her that he had tried to teach A.N. things about life. At trial, defendant denied this meant sexual things. He denied any sexual touching of any kind and furthermore questioned why A.N. never mentioned the tattoo on his penis which he received in January 2009. He also denied any claims about a methamphetamine lab or that he made A.N. watch pornographic movies with him.

Needham, 721 S.E.2d 763 (footnote omitted).

3

## II.    STANDARD OF REVIEW

### A.  Summary Judgment Standard

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. CIV. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).  Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

### B.  Section 2254 Standard

In addition to the motion for summary judgment standard set forth above, this Court must also consider the Petition for Writ of Habeas Corpus under the requirements set forth in 28 U.S.C. § 2254.  Section 2254(d) provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Tice v. Johnson, 647 F.3d 87, 103 (4th Cir. 2011).

A claim is considered "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." Young v. Catoe, 205 F.3d 750, 755 (4th Cir. 2000) (quoting Thomas v. Davis, 192 F.3d 445, 455 (4th Cir. 1999)). A state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "It is not enough for us to say that, confronted with the same facts, we would have applied the law differently; we can accord [the petitioner] a remedy only by concluding that the state court's application of the law in his case was objectively unreasonable." See Tice, 647 F.3d at 103 (citing Williams v. Ozmint, 494 F.3d 478, 483-84 (4th Cir. 2007)). "[W]e will not discern an unreasonable application of federal law unless 'the state court's decision lies well outside the boundaries of permissible differences of opinion.'" Id. at 108 (quoting Goodman v. Bertrand, 467 F.3d 1022, 1028 (7th Cir. 2006)).

In addition, "[a] federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Walker v. Martin, 131 S.Ct. 1120, 1127 (2011) (internal quotations and citations omitted). "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." Id. (citation omitted). A procedural default also occurs "when a habeas petitioner fails to exhaust

available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Hyman v. Keller, No. 10-6652, 2011 WL 3489092, at *9 (4th Cir. July 21, 2011) (quoting Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998)); see also 28 U.S.C. § 2254(b)(1)(A).

Section 2254's exhaustion requirement demands that a petitioner give "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." Larry v. Branker, 552 F.3d 356, 366 (4th Cir. 2009) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999)). However, a petitioner may overcome a finding of procedural default by showing cause and prejudice arising from the asserted constitutional error. McCarver v. Lee, 221 F.3d 583, 591-92 (4th Cir. 2000). To show "cause," a petitioner may make "a showing that the factual or legal basis for the claim was not reasonably available to counsel." Id. at 591 (quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991)). To establish "prejudice," a petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Id. at 592 (quoting United States v. Frady, 456 U.S. 152, 170 (1982)).

A habeas petitioner may also overcome his procedural default by demonstrating that the court's failure to consider the claim will result in a fundamental miscarriage of justice. Hedrick v. True, 443 F.3d 342, 359 (4th Cir. 2006) (citing Coleman v. Thompson, 501 U.S. 722, 750 (1991)). The "fundamental miscarriage of justice" exception applies only to a narrow class of cases involving extraordinary instances "where a constitutional violation has 'probably resulted'

in the conviction of one who is 'actually innocent' of the substantive offense." Dretke v. Haley, 541 U.S. 386, 392-94 (2004) (citing Murray v. Carrier, 477 U.S. 478, 494-96 (1986)).

## III.    DISCUSSION

### A.   Petitioner's Contention that the State Introduced Inadmissible Evidence Against Him at Trial

In his first claim, Petitioner contends that the State introduced inadmissible evidence against him at trial.  In support of this claim, Petitioner makes two arguments.  First, Petitioner contends that the trial court erroneously allowed the State to question him on cross-examination about an intake document from a North Carolina correctional facility, Neuse Correctional Institution.  Second, Petitioner argues that the trial court erred in allowing a State's witness, Petitioner's father, Ronald Needham, to testify that the victim A.N. had never lied to him and that Petitioner had not told him the truth since he was thirteen years old.

#### 1.   Petitioner's Contention that the Admission of a July 2009 DOC Intake Document at Petitioner's Trial Constituted A Confrontational Clause Violation

As part of his argument that he did not sexually molest his daughter, Petitioner claimed at his trial that he had a tattoo on his penis when at least some of the acts of alleged molestation occurred.  Specifically, Petitioner testified that he had a tattoo of the words "your name" on his penis and that the alleged crimes could not have happened because the victim did not have any knowledge of the tattoo.   Petitioner testified at trial that, "if this child has had my penis in her hand and her mouth and everywhere else, then how did she miss the tattoo that's on my penis?" (Doc. No. 13-18 at 277: Trial Tr.).  Jessica Hughes, Petitioner's live-in girlfriend at the time of the alleged sexual abuse, also testified concerning the tattoo on Petitioner's penis, including that

Petitioner gave himself the tattoo in January 2009.  (Doc. No. 13-19 at 318-20).

On cross-examination, Petitioner testified that he gave himself the tattoo in January 2009 with a homemade tattoo gun after he got out of jail for driving while license revoked.  (Doc. No. 13-18 at 294-95).  Petitioner's testimony indicated that on July 17, 2009, he was remanded to the custody of the DOC after having again been convicted for driving while licensed revoked.  (Id. at 301).  The State then questioned Petitioner about a DOC intake document dated July 17, 2009, identifying Petitioner and his tattoos.  (Id. at 301-03).  The intake document did not reference the tattoo on Petitioner's penis.  Petitioner testified that the document was incorrect regarding a few of his tattoos, including the one he claimed to have had on his penis.  (Id.).  Petitioner had no explanation as to why some of his tattoos were not listed or incorrectly characterized in the intake document, other than to say the document was incorrect.  (Id. at 304).  At the conclusion of Petitioner's presentation of evidence, the State moved to admit the DOC intake document, and it was admitted without objection.  (Doc. No. 13-19 at 343).

As to his first contention regarding alleged inadmissible evidence at trial, Petitioner contends that his Sixth Amendment right to confrontation was violated when the State introduced the July 17, 2009, North Carolina DOC intake document at Petitioner's trial.  Petitioner also argues that he has new evidence proving that he did, in fact, have the tattoo at the time the victim claimed he abused her.  Petitioner notes that a DOC Report of Medical Exam dated July 23, 2009, indicates that he did have the tattoo on his penis on that date.[1]  See (Doc.

---

[1]  Although Petitioner argued in his MAR that his attorney should have conducted a proper investigation to rebut the State's use of the DOC intake form, Petitioner did not contend in his MAR, nor does he appear to be contending here, that his attorney should have introduced the DOC medical report at trial.  In fact, in his MAR, Petitioner specifically stated that the medical record was not available to him or his attorney at the time of trial.  (Doc. No. 13-9 at 7).

No. 13-9 at 42).  Petitioner argues that the admission of the intake form violated his

confrontation clause rights and that counsel was ineffective for not objecting to admission of the

form.  Petitioner further argues that the State's use of the document was prejudicial because the

tattoo on his penis was the only physical evidence against him at trial and that the State used it to

ruin his credibility.

Petitioner raised the substance of his confrontation clause claim in his MAR, and the

MAR Court denied the claim.[2]  The issue before this Court on habeas review is whether the

MAR Court's adjudication of this claim was contrary to or an unreasonable application of clearly

established Supreme Court law.  In Crawford v. Washington, 541 U.S. 36, 68 (2004), the

Supreme Court reiterated that "[w]here testimonial evidence is at issue . . . , the Sixth

Amendment demands what the common law required: unavailability and a prior opportunity for

cross-examination."  As such, a confrontation clause violation occurs where a court allows the

admission of "testimonial" statements against a criminal defendant who did not have an

opportunity to cross-examine the witness.  Id.  The Supreme Court in Crawford did not,

however, give lower courts a precise definition of the term "testimonial."  See Crawford, 541

U.S. at 68.  According to Crawford, in its broadest formulation, testimonial statements are

"statements that were made under circumstances which would lead an objective witness

---

[2]  As Respondent notes, the MAR Court conflated the analysis regarding the confrontation clause
issue with Petitioner's newly discovered evidence claim concerning the July 23, 2009, DOC
medical form, which indicated that Petitioner did have a tattoo on his penis as of July 2009.[2]
(Doc. No. 13-11 at 1-2).  In any regard, the MAR Court essentially assumed arguendo that the
admission of the DOC intake form was error, but found that the error was harmless because it
was irrelevant that Petitioner had the tattoo in July 2009, given the other evidence at trial.  (Id. at
2).  Relevant to the MAR Court's analysis, the transcript reveals that the relevant period of time
setting the offense dates for Petitioner's crimes began January 13, 2007 and continued over the
next year until the victim's thirteenth birthday, during which time there were some thirty to forty
incidents of abuse, according to the victim's testimony.  See Needham, 721 S.E.2d 763, at *1.

reasonably to believe that the statement would be available for use at a later trial." 541 U.S. at 52 (quotation marks and citation omitted).

Since Crawford, the United States Supreme Court has continually refined and clarified the meaning of "testimonial," but the Supreme Court has never specifically addressed the situation presented by Petitioner's Ground One. In Melendez-Diaz v. Massachusetts, the Supreme Court concluded that forensic lab certificates are testimonial for the purpose of Crawford, but nonetheless emphasized the following:

> Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because--having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial--they are not testimonial.

557 U.S. 305, 324 (2009).

Here, the MAR Court's rejection of Petitioner's confrontation clause claim based on admission of the DOC intake document was neither contrary to nor an unreasonable application of Crawford and its progeny. First, the state court adjudication was not contrary to any clearly established Supreme Court law because the Supreme Court has never found a confrontation clause violation under the same facts presented here. Nor was the state court adjudication of Petitioner's confrontation clause claim an unreasonable application of Crawford and its progeny. As Respondent notes, the content of the DOC intake document was not "testimonial" under Crawford's general definition of that term, as the intake report was created for a routine DOC administrative purpose, i.e., prisoner identification, and was obviously not created to later prove some fact at trial. See Melendez-Diaz, 557 U.S. at 309. Moreover, although the DOC intake document was ultimately admitted without limitation, the State's sole use of the document was to impeach Petitioner, not to admit the document for its truth. It is well established that the

confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." <u>Crawford</u>, 541 U.S. at 59 n.9.

In sum, the MAR Court's adjudication of Petitioner's confrontation clause claim arising out of the admission of the July 17, 2009, DOC intake form was neither contrary to nor an unreasonable application of clearly established Supreme Court law, nor was it an unreasonable application of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to relief on the first contention in Ground One.

**2. Petitioner's Contention that His Father's Testimony Regarding Petitioner's Truthfulness Violated Petitioner's Right to Due Process**

Petitioner argues in the second portion of Ground One that the trial court erred in allowing a prosecution witness, Petitioner's father Mr. Needham, to testify that the victim A.N. had never lied to him and that Petitioner had not told him the truth since he was thirteen years old. Petitioner argues that the use of this evidence in his case destroyed the fundamental fairness of his trial and violated his right to due process.

Petitioner's contention here does not entitle him to relief because it is not cognizable in this proceeding. Although Petitioner uses the phrases "due process" and "fundamental fairness," he is arguing in his second contention of Ground One that an error in the admission of evidence in state court was erroneous, specifically the admission of character evidence. This is, of course, a state law issue that is not cognizable on federal habeas review. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.");

see also Swarthout v. Cooke, 131 S. Ct. 859, 863 (2011) (noting that the Supreme Court has "long recognized that a mere error of state law is not a denial of due process"). Indeed, Petitioner raised this claim as an error of state law in his appeal to the North Carolina Court of Appeals, and the state court adjudicated the claim in terms of state law only.

In any event, there is no due process violation for the same reasons the state court concluded there was no violation of state law or prejudice to defendant in the admission of the above-noted testimony. Moreover, the North Carolina Court of Appeals rejected Petitioner's claim, indicating that its review was for plain error because Petitioner did not object to the admission of the challenged evidence at trial.[3] Needham, 721 S.E.2d 763, at *2-3. This plain error review constitutes enforcement of the procedural bar for failing to object at trial, precluding federal habeas review. See Daniels v. Lee, 316 F.3d 477, 487-88 (4th Cir. 2003) (availability of plain error review in state appellate court of claim which was procedurally defaulted because not raised at trial does not eliminate prior procedural default), cert. denied, 540 U.S. 851 (2003).

In sum, for the reasons stated herein, Petitioner is not entitled to relief on the second contention in Ground One.

### B. Petitioner's Contention that He Was Denied Counsel, Received Ineffective Assistance of Counsel, and Was Denied Due Process

In Ground Two, Petitioner contends that he was denied counsel at a critical stage of trial,

---

[3] In addition to conducting plain error review, the North Carolina Court of Appeals found no error, much less plain error, in the admission of the challenged evidence. Briefly, the state court concluded that the admission of the evidence Petitioner challenged was proper because Petitioner himself opened the door and put his and the victim's character for truthfulness at issue at trial. Id. at *4. The court went on to conclude that, even if the admission of the evidence was erroneous, it did not prejudice Petitioner. Id.

received ineffective assistance of counsel, and was denied due process. More specifically, Petitioner contends that he was denied counsel during plea negotiations and he did not understand the plea agreement that the State offered to him, and that he received ineffective assistance of counsel for a variety of reasons. None of the allegations in Ground Two entitle Petitioner to relief.

### 1. Petitioner's Contention that He Was Denied Counsel During Plea Bargaining

First, Petitioner argues that he was denied counsel during plea bargaining, pointing out that at his "not guilty" hearing he informed the trial court that he had not discussed the State's plea offer with his attorney. Additionally, Petitioner argues that he did not understand that the State was offering him the opportunity to plead guilty to child abuse rather than second-degree rape. Petitioner states that, had he known the offer was for the offense of child abuse, he would have taken it. Petitioner blames his lack of understanding on his attention deficit hyperactivity disorder and other mental maladies. Petitioner contends that he had no counsel when considering the plea and that had his attorney explained the plea to him he would have taken it. Petitioner claims that affidavits attached to his MAR support this contention.

Petitioner's contention is meritless. First, nothing in the record indicates that counsel was never available to Petitioner to assist him in considering the plea offer. The transcript of the "not guilty" hearing indicates that Petitioner was already being represented by Mr. Wilson at that hearing. (Doc. No. 13-20 at 1). Notably, the affidavits Petitioner attached to his MAR that he claims support this part of Ground Two indicate only that the affiants heard Petitioner tell the state trial court that he did not discuss the plea offer with counsel and that he told them he thought the offer was for second-degree rape. The affidavits offer nothing to indicate that

13

Petitioner did not have the assistance of an attorney.  See (Doc. Nos. 13-9; 13-10).  Petitioner's claim that he was not assisted by an attorney in regards to the plea offer is dismissed as conclusory and unsupported.  See Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992).

 To the extent that Petitioner is contending that his counsel was ineffective in the plea negotiations for not advising him regarding his plea, Petitioner raised this contention in his MAR.  (Doc. No. 13-10 at 7-14).  The MAR Court rejected the substance of this contention as follows:

> Defendant was examined carefully on the record both by Judge Morgan at a plea conference and by Judge Kincaid prior to trial upon his understanding of the State's plea offer.  On each occasion, Defendant stated that he understood the offer, rejected it and insisted upon going to trial.  Now he was changed his mind.  The Defendant made his choice and took his chances.  It is too late to go back.

(Doc. No. 13-10 at 2).  The MAR Court's adjudication of Petitioner's contention was neither contrary to nor an unreasonable application of Supreme Court case law, nor was it an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  A defendant's right to counsel "extends to the plea-bargaining process." Lafler v. Cooper, 132 S. Ct. 1376, 1384 (2012).  To establish an ineffective assistance of counsel claim, a defendant must demonstrate that (1) counsel's performance was deficient and (2) that he was prejudiced thereby, normally proving that but for counsel's deficient performance, there was a reasonable probability of a different result.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  To demonstrate prejudice in the context of a rejected plea offer, however,

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence

14

that in fact were imposed.

Lafler, 132 S. Ct. at 1385. The Supreme Court has noted that:

> [t]he representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

Blackledge v. Allison, 431 U.S. 63, 73-74 (1977).

Here, at Petitioner's pretrial, "not guilty" hearing, the trial court specifically inquired of Petitioner regarding the plea offer by the State. See (Doc. No. 13-20). The trial court very clearly asked Petitioner whether it was his understanding that the plea offer was for him to plead guilty to felony child abuse, second-degree kidnapping, and indecent liberties; and for him to receive three consecutive sentencing terms of 104 to 134 months' imprisonment, 30 to 45 months' imprisonment, and 17 to 21 months' imprisonment, the last of which would be suspended while he served probation. (Id. at 1). Petitioner affirmed that he understood the offer. (Id.). Petitioner further affirmed that he knew what sentences he would be facing if he went to trial. (Id. at 2). Petitioner noted that he had not discussed the potential sentences with his attorney, but that he was fully aware of the offer and the possible consequences if found guilty. (Id. at 2-3). Petitioner affirmed that he alone made the decision as to whether he wanted to accept or reject the offer, specifying that he declined to take the offer. (Id. at 3).

Immediately before trial, the trial court inquired of the State and counsel for Petitioner concerning Petitioner's rejection of the State's plea offer. (Doc. No. 13-17 at 5-7). Petitioner's attorney indicated to the court that Petitioner believed he was rejecting an offer regarding second-degree rape, not felony child abuse. See (Id.). However, according to his attorney,

Petitioner did understand the sentencing terms and, by rejecting the offer, was rejecting the terms. Specifically, his attorney noted that "the sentence is what he did in fact turn down." (Id. at 6). As pointed out by the State, the sentence for felony child abuse was the same as the one for second-degree rape. (Id. at 6-7).

Even assuming that Petitioner somehow misunderstood that by the plea offer he would be pleading guilty to second-degree rape, the record indicates that Petitioner would have still rejected the offer to plead guilty to felony child abuse because he disagreed with the sentencing terms, which would have been the same for either offense.[4] See (Doc. No. 13-17 at 7) (where counsel noted that the sentences were "the same" and stated that "[t]he sentence is what [Petitioner] did in fact turn down"). Here, Petitioner was fully informed of the plea offer, and he rejected it based on the sentencing term. In sum, the MAR Court's adjudication of this part of Petitioner's Ground Two was neither contrary to nor an unreasonable application of clearly established Supreme Court law.

### 2. Petitioner's Various Claims of Ineffective Assistance of Counsel

Petitioner next alleges in Ground Two the following ineffective assistance of counsel claims: that trial counsel was ineffective for (1) failing to subpoena witnesses; (2) operating under a conflict of interest because counsel interviewed Petitioner's father, who would testify for the State at Petitioner's trial; (3) failing to hire a private investigator; (4) failing to educate himself as to physical and psychological issues regarding child sex abuse and rape, particularly

---

[4] Petitioner argued in his MAR that trial counsel was ineffective for failing to inform him that he could have pled guilty without admitting guilt. (Doc. No. 13-9 at 31). However, the record reveals that such a plea was not what was offered by the State; this was, thus, not an option for Petitioner; and counsel was, of course, not ineffective for not informing him of a term of the State's offer that did not exist.

since the State had no physical or DNA evidence that Petitioner penetrated the victim's vaginal canal; and (5) failing to object based on the issue presented in Ground One or to rebut the evidence introduced in error as alleged in Ground One. Petitioner also argues there was cumulative error based upon the totality of counsel's individual errors.

### a. Counsel's Failure to Subpoena Certain Fact Witnesses

Petitioner first complains that counsel was ineffective for failing to subpoena certain fact witnesses. In support of this claim, Petitioner points to three affidavits he attached to his MAR, specifically the affidavits of Petitioner's mother Jacquelyn Yawn,[5] his mother's boyfriend Terry Ballard, and family friend Melanie Weisenthal.

Allegedly relevant to Petitioner's ineffectiveness claim, Ms. Yawn stated in her affidavit that the State threatened the victim with prosecution if she did not testify. (Doc. No. 13-9 at 47-49: Yawn Aff.). Specifically, Ms. Yawn stated that the victim told her that the prosecutor said to the victim that she would throw the victim in jail for filing a false police report if she did not testify. (Id.). Mr. Ballard's affidavit details his account of Petitioner's understanding of the State's plea offer. (Doc. No. 13-10 at A20: Ballard Aff.). Next, Ms. Weisenthal stated in her affidavit that she was very close to the victim, that the victim told her everything, the victim did not tell her about the sexual abuse, that Ms. Weisenthal did not see any abuse, and that, if she had, she would not have written the affidavit. (Id. at A61-A62: Weisenthal Aff.).

First, decisions on which witnesses to call at trial are strategic and tactical decisions left to the discretion of trial counsel, and are therefore entitled to deference by this Court. See

---

[5] Petitioner's attorney did call Ms. Yawn to testify at trial. (Doc. 13-19 at 328). Petitioner's complaint appears to be that the attorney did not question Ms. Yawn about the content of her affidavit.

<u>Strickland</u>, 466 U.S. at 689-90.  Second, the failure of counsel to subpoena the above-noted witnesses or, in Ms. Yawn's case, the failure to ask her questions based on the content of her affidavit, was not ineffective assistance.  Regarding Ms. Yawn's statement, what she swore to was hearsay and hearsay within hearsay, and was, thus, inadmissible.  Furthermore, to the extent that Ms. Yawn's affidavit indicated that the victim was hesitant to testify, such hesitancy was already conveyed by the victim at trial.  The victim stated that she did not want to testify at first but changed her mind.  (Doc. No. 13-17 at 114).  Specifically, the victim stated the following at trial:

> Q [THE STATE];     Did you want to come testify?  Did you always want to?
> A [THE VICTIM]:     No, I did not always want to.  At first, I was guilty.  I felt like you know, this is my fault, I never should have said anything, I should have kept my mouth shut.  I do love my father, and the fact that I do love my father has been very hard to come say this.  But I know that if I didn't have said – if I didn't said [sic] this, there – there's a chance that it could happen again.  And since, you know, my mom and my dad still have visitation rights over me, there was a way he could have gotten to me, especially after I turned eighteen.  You know, it could have happened again, and I was not willing to take that chance, not at all.

(<u>Id.</u> at 104).  Thus, the jury already knew about the victim's initial hesitancy in testifying.[6]

Furthermore, the trial evidence established that Petitioner attempted to manipulate the

---

[6]   Respondent contends, moreover, that even if Petitioner could overcome the fact that Ms. Yawn's testimony as to the content of her affidavit would have been hearsay, it was still not admissible.  According to Respondent, the only purpose for questioning Ms.Yawn about the content of her affidavit would have been to impeach the victim on a collateral matter, i.e., that the victim was testifying of her own volition.  Respondent further contends that because North Carolina evidentiary rules do not permit the admission of such evidence, the attorney could not have questioned Ms. Yawn about any coercion.  <u>See</u> <u>State v. Hunt</u>, 324 N.C. 343, 348, 378 S.E.2d 754, 757 (1989) (citation omitted) ("[E]xtrinsic evidence of prior inconsistent statements may not be used to impeach a witness where the questions concern matters collateral to the issues.").

victim into not testifying. Moreover, the victim's testimony as to Petitioner's manipulation indicated what a strong witness she was, which rebuts any allegation by Petitioner or his own mother that the victim was coerced into testifying. The victim testified to and read letters from Petitioner in which he pled with her not to testify, telling her she did not have to say anything, and "[w]hat hurts me hurts you, don't you know that." (Doc. No. 13-17 at 98-103). In these letters, Petitioner also told the victim that he loved her, that he was sorry, that he missed her, that the people she trusted tricked her, and that his life was on the line. (Id. at 99-103).

Petitioner asked the victim to question her mother's love for her, pointing out that "[i]f you bury me . . . [,] you won't have me to come rescue you or me to come home to." (Id. at 102). The victim testified that these letters made her mad, specifically noting that she realized Petitioner "was trying to manipulate me, he was trying to guilt trip me into not saying anything." (Id. at 98). The victim noted that she was "infuriat[ed]," testifying "I couldn't believe that he was actually seriously – I thought to myself . . . is he seriously writing this right now . . . [t]his is ridiculous." (Id.). The victim further noted

> definitely there are things that I've forgotten. But since so much has happened, I was seeing a therapist, I had struggled with depression. I ended up having to not go to school for the end of the ninth grade because I was so depressed. You know, that's where my mom actually thought I had overdosed on pills in my house. She took me to the hospital; I didn't. You know, it's affected me in ways you just can't imag[ine], and I'm tired of it. Frankly, I'm just tired of it and I'm ready to move on, and I'm ready to not have to feel sorry for myself and not have to think about the wrongdoings that have happened.

(Id. at 103-04). Finally, nothing in the record suggests that the prosecution encouraged the victim to present false testimony, even assuming the prosecutor had in fact informed her that she could be prosecuted for filing a false police report. Petitioner was therefore not prejudiced by the failure of counsel to question Ms. Yawn about what she wrote in her affidavit. Given the

inadmissibility of what would have been Ms. Yawn's testimony, and its limited evidentiary value, particularly in light of the strength of the victim's testimony, Petitioner's counsel was not ineffective for failing to question Ms. Yawn as Petitioner alleges he should have.

Next, Mr. Ballard's statement in his affidavit concerns only Petitioner's allegations that he did not understand his plea offer. (Doc. No. 13-10 at A20). As such, there is no indication as to what Mr. Ballard would testify to at trial, and therefore, his affidavit does not support Petitioner's allegation of ineffective assistance of counsel. Finally, Ms. Weisenthal's affidavit does not support Petitioner's ineffectiveness claim either. As noted above, Ms. Weisenthal stated that she was very close with the victim, that the victim told her everything, that the victim did not tell her about the sexual abuse, that she did not see any abuse, and that if she had she would not have written the affidavit. (Id. at A61-A62). Even assuming Ms. Weisenthal's testimony was admissible and even assuming counsel should have called her to testify, it would not have resulted in a different jury verdict, and thus, Petitioner suffered no prejudice. The victim gave detailed testimony of the abuse she suffered. She testified that she never told social services because she was scared of her father because he had on occasion talked about killing her, his girlfriend Ms. Hughes, and himself. (Doc. No. 13-17 at 59-60; 83-84). The victim testified that she was scared of "any sexual repercussions" or other "physical repercussions." (Id. at 84). She stated, "I stayed like the perfect kid, nobody knew . . . . I was scared of what was going to happen to me, I was scared of what was going to happen to my dad . . . ." (Id.). The victim's well-articulated fear explained why she would not have told even such an allegedly close family friend as Ms. Weisenthal. Moreover, the State presented the testimony of pediatrician Dr. Patricia Grinton, accepted by the trial court as an expert in child abuse, who

indicated that it was not typical for a child to tell about abuse immediately, particularly where a child had been threatened. (Doc. No. 13-18 at 15). Given the above-noted analysis, Petitioner's counsel was not ineffective in failure to call the fact witnesses Petitioner now claims counsel should have subpoenaed or questioned.

### b. Ineffective Assistance of Counsel Based on the Fact that Counsel Interviewed Petitioner's Father

In the next part of Ground Two, Petitioner alleges that counsel was ineffective for operating under a conflict of interest because counsel interviewed Petitioner's father, who testified for the State at Petitioner's trial without Petitioner's consent. Petitioner raised the substance of this contention in his MAR. (Doc. No. 13-9 at 37-38). In rejecting the claim, the MAR Court provided the following analysis:

> Defendant's father testified at trial. In response to a question about the reputation of his own son, the Defendant[,] for truthfulness, Mr. Needham said: "well, I don't know that he's ever told me anything that wasn't a lie since he was thirteen years old." (Court of Appeals Opinion, pages 7-8). The fact that [trial counsel] chose to interview Defendant's father in preparation for trial shows diligence on his part, but also illustrates what an arduous task was assigned to counsel in trying to present a defense under such a horrible set of circumstances.

(Doc. No. 13-11 at 4).

The MAR Court's adjudication of this part of Petitioner's ineffective assistance of counsel claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law, as Petitioner has simply not shown that counsel rendered deficient performance in choosing to interview Petitioner's father in preparation for trial.

### c. Ineffective Assistance of Counsel Based on Counsel's Failure to Hire A Private Investigator and Failing to Educate Himself As to Physical and Psychological

### Issues Regarding Child Sex Abuse and Rape

Next, Petitioner argues counsel was ineffective for failing to hire a private investigator, and failing to educate himself as to physical and psychological issues regarding child sex abuse and rape, particularly since the State had no physical or DNA evidence that Petitioner penetrated the victim's vaginal canal. A review of Petitioner's MAR indicates that, by these two grounds, Petitioner is generally alleging counsel was inadequate in investigating the physical evidence, or lack thereof, in support of the charges against Petitioner. Counsel was not ineffective in this regard because, as noted by the MAR Court in rejecting Petitioner's claim, in North Carolina, it is not necessary to show penetration in the vaginal cavity to prove sex crimes. The MAR Court stated:

> Contrary to Defendant's assertions, penetration is not a complicated scientific issue. As the jury was instructed, it is only necessary to show penetration, however slight, of the female sex organ by the male sex organ (with or without the tattoo). Contrary to his assertions, there is no requirement that the penis be inserted "into the vaginal canal." Defendant's trial counsel was sufficiently educated to deal with this issue effectively. Unfortunately, Defendant did not give him much to work with . . . .

(Doc. No. 13-11 at 4); see also State v. Summers, 92 N.C. App. 453, 456, 374 S.E.2d 631, 633 (1988) (defining vaginal intercourse, which is an element of rape, as "the slightest penetration of the female sex organ by the male sex organ" (citation and internal quotation marks omitted)), cert. denied, 324 N.C. 341, 378 S.E.2d 806 (1989), and N.C. GEN. STAT. § 14-27.1(4) (2011) (defining sexual acts for offense other than rape, as meaning, in addition to a specified list of acts, "the penetration, however slight, by any object into the genital or anal opening of another person's body"). Here, the MAR Court's adjudication of Petitioner's claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law.

**d.  Counsel's Failure to Object to the Error Petitioner Alleged in Ground One**

Next, Petitioner contends that counsel was ineffective for not objecting to the error Petitioner alleged in Ground One, or presenting evidence in rebuttal.  Because there was no error in Ground One, there could be no corresponding ineffective assistance of counsel.

**e.  Petitioner's Allegation of Cumulative Error**

In the last of his ineffective assistance of counsel contentions, Petitioner alleges cumulative error based upon the totality of each of the alleged individual errors by his counsel. Petitioner raised the substance of his claim of cumulative error in his MAR, and the MAR Court denied this claim.  Petitioner's cumulative error argument is meritless because it is well established that a habeas petitioner is not entitled to relief on allegations of cumulative effect where, as here, there are no individual constitutional violations.  See Fisher v. Angelone, 163 F.3d 835, 852-53 (4th Cir. 1998) (holding that "ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively").

In sum, Petitioner's Ground Two is without merit.

**C.  Petitioner's Contention that the Prosecution Obtained Witness Testimony through Coercion by Threatening the Victim with Criminal Prosecution if She Did Not Testify**

In his third claim, Petitioner contends that the prosecution illegally obtained witness testimony through coercion by threatening the victim with criminal prosecution if she did not testify.  Petitioner raised Ground Three in his MAR, and the MAR Court denied the claim.  The MAR Court's adjudication of Petitioner's Ground Three was neither contrary to nor an unreasonable application of Supreme Court case law.  It is well established under Supreme Court

law that a State's "deliberate deception of a court and jurors by the presentation of known false evidence" violates due process.  Giglio v. United States, 405 U.S. 150, 153 (1972).  Here, however, there was no due process violation because Petitioner simply presented no evidence that the prosecution encouraged the presentation of or presented false testimony.  See Napue v. Illinois, 360 U.S. 264, 269 (1959) ("[A] State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction.").  Nor does Petitioner even make any allegation that the State failed to disclose anything regarding what the prosecution said to the victim.  See Brady v. Maryland, 373 U.S. 83, 87 (1963).

In sum, Petitioner's Ground Three is without merit.

### D.  Petitioner's Contention that He Was Denied His Right to Free Speech at Trial While Testifying

In his fourth claim, Petitioner contends that he was denied his right to free speech at trial while testifying.  In support of this ground, Petitioner argues that, while testifying at trial, he tried to introduce letters from his mother, Ms. Yawn, in which she talked about the prosecution's alleged threats to the victim and the victim's suicide attempt.  Petitioner attached the letters to his MAR.  (Doc. No. 13-9 at 43-46).  Petitioner raised Ground Four in his MAR, and the MAR Court rejected the claim in its order denying the MAR, stating as follows:

> Defendant next claims that the trial judge denied him his right of free speech during his trial when he "refused to allow me to speak freely."  The 1st Amendment does not entitle the Defendant to introduce incompetent or inadmissible evidence, as he was attempting to do when "silenced" by Judge Kincaid.  The Defendant had no "right' to offer double hearsay consisting of a letter purportedly written by his mother setting out comments allegedly made by someone else as a part of his defense.

(Doc. No. 13-11 at 3).  The MAR Court's adjudication of Petitioner's Ground Four was neither

contrary to nor an unreasonable application of clearly established Supreme Court case law.

In sum, Petitioner's Ground Four is without merit.

## IV. CONCLUSION

For the reasons stated herein, Respondent is entitled to summary judgment as to all of Petitioner's claims.

**IT IS, THEREFORE, ORDERED** that:

1. Respondent's Motion for Summary Judgment, (Doc. No. 12), is **GRANTED**, and the petition is dismissed.

2. It is further ordered that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: October 15, 2013

Frank D. Whitney
Chief United States District Judge